ZENITH RADIO CORPORATION

v.

MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD. et al.

NATIONAL UNION ELECTRIC CORPORATION

v.

MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD. et al.

In re JAPANESE ELECTRONIC PRODUCTS ANTITRUST LITIGATION.

Civ. A. Nos. 74–2451, 74–3247.
MDL No. 189.

United States District Court,
E. D. Pennsylvania.

April 14, 1980.

As Amended April 23, 1980.

See also, D.C., 494 F.Supp. 1190.

Blank, Rome, Comisky & McCauley by Edwin P. Rome, William H. Roberts, John Hardin Young, Arnold I. Kalman, Kathleen H. Larkin, Norman E. Greenspan, Lawrence S. Bauman, Philadelphia, Pa., for Zenith Radio Corporation and National Union Electric Corporation, plaintiffs.

Morton P. Rome, Wyncote, Pa., for National Union Electric Corporation, plaintiff.

Philip J. Curtis, John Borst, Jr., Glenview, Ill., for Zenith Radio Corporation, plaintiff.

Mudge, Rose, Guthrie & Alexander by Donald J. Zoeller, John P. Hederman, Thomas P. Lynch, Howard C. Crystal, Robert A. Jaffe, Shelly B. O'Neill, Mark K. Neville, Jr., New York City, Drinker, Biddle & Reath by Patrick T. Ryan, Philadelphia, Pa., for Tokyo Shibaura Elec. Co., Ltd. and Toshiba America, Inc., defendants; defense coordinating counsel.

Duane, Morris & Heckscher by Henry T. Reath, Terry R. Broderick, Philadelphia, Pa., Crummy, Del Deo, Dolan & Purcell by John T. Dolan, Newark, N.J., Baker & McKenzie by Hoken S. Seki, Thomas E. Johnson, Chicago, Ill., for Mitsubishi Electric Corporation, moving defendant.

Reid & Priest by Charles F. Schirmeister, Robert J. Lynch, New York City, L. Peter Farkas, Washington, D.C., for Mitsubishi Corporation and Mitsubishi International Corporation, defendants.

Weil, Gotshal & Manges by Ira M. Millstein, A. Paul Victor, John F. Carney, Joel B. Harris, Kevin P. Hughes, Robert K. Hood, H. Adam Prussin, Jeffrey L. Kessler, Stuart Peim, Lenore Liberman, Gayle E. Hanlon, Alan Rothstein, Makoto Matsuo, New York City, Morgan, Lewis & Bockius by Raymond T. Cullen, Philadelphia, Pa., for Matsushita Elec. Indus. Co., Inc., Matsushita Elec. Corp. of America, Matsushita Electronics Corp., Matsushita Elec. Trading Co., and Quasar Electronics Corp., defendants.

Metzger, Shadyac & Schwarz by Carl W. Schwarz, Michael E. Friedlander, William H. Barrett, Stephen P. Murphy, William B.T. Mock, Jr.; Tanaka, Walders & Ritger by Lawrence R. Walders, B. Jenkins Middleton, Washington, D.C., Pepper, Hamilton, & Scheetz, Philadelphia, Pa., for Hitachi, Ltd., Hitachi Sales Corporation of America, and Hitachi Kaden Hanbai Kabushiki Kaisha, defendants.

Wender, Murase & White by Peter J. Gartland, Gene Yukio Matsuo, Peter A. Dankin, Lance Gotthoffer, New York City, for Sharp Corporation and Sharp Electronics Corporation, defendants.

Whitman & Ransom by Patrick H. Sullivan, Dugald C. Brown, Kevin R. Keating, Michael S. Press, New York City, Pepper, Hamilton & Scheetz by Charles J. Bloom, Philadelphia, Pa., for Sanyo Elec., Inc., Sanyo Elec. Co., Ltd., and Sanyo Elec. Trading Co., Ltd., defendants.

Arnstein, Gluck, Weitzenfeld & Minow by Louis A. Lehr, Jr., Stanley M. Lipnick, John L. Ropiequet, Chicago, Ill., for Sears, Roebuck & Co., defendant.

## OPINION

### (INTRODUCTION TO SUMMARY JUDGMENT MOTIONS; SUBJECT MATTER JURISDICTION)

#### I. *PRELIMINARY STATEMENT*

This is the first of a series of opinions which will address, piecemeal, the plethora of issues presented by the voluminous summary judgment motions before us in this massive litigation. This opinion will discuss the contention raised in the motion of Mitsubishi Electric Corporation (MELCO) that an American court lacks subject matter jurisdiction over an antitrust claim against a foreign defendant such as MELCO whose actions took place in a foreign land (Japan). The motion will require us to examine the extraterritorial reach of the United States antitrust laws and to define both a methodology and appropriate standards for determining when exercise of that extraterritorial jurisdiction is appropriate. Because this opinion is the first in a series, we will also use it to set forth background material which we can incorporate by reference in subsequent opinions addressing the summary judgment motions.

The plaintiffs in this action are Zenith Radio Corporation ("Zenith") and National Union Electric Corporation ("NUE"). NUE, the corporate successor to Emerson Radio Co. and one of the pioneers in the radio and TV industry, ceased all production of television receivers in February of 1970.[1] That December, it filed the first of these suits,[2] alleging that the Japanese defendants and others had conspired to take over the American consumer electronic products industry and thereby to drive NUE out of business. In 1974, Zenith filed an action making similar allegations.[3] The NUE action was then transferred to this district for coordinated or consolidated pretrial proceedings with the Zenith action;[4] the transfer was later made unconditional and the actions were consolidated for trial.[5]

The ten principal defendants are Japanese manufacturers of consumer electronic products (Matsushita Electric Industrial Co., Ltd.; Toshiba Corporation; Hitachi, Ltd.; Sharp Corporation; Sanyo Electric Co., Ltd.; Sony Corporation; and Mitsubishi Electric Corporation ("MELCO")); a Japanese trading company (Mitsubishi Cor-

1. After ceasing production of television receivers, NUE resold television receivers purchased from other manufacturers until discontinuing its television business entirely in 1972.

2. *National Union Electric Corp. v. Matsushita Electric Industrial Co.*, Civil No. 1706–70 (D.N.J., filed December 21, 1970).

3. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, Civil Action No. 74–2451 (E.D.Pa., filed Sept. 20, 1974).

4. *In Re Japanese Electronic Products Antitrust Litigation*, 388 F.Supp. 565 (J.P.M.D.L.1975).

5. Pretrial Order No. 182, filed June 6, 1979 in M.D.L. 189.
 This case was transferred to our docket from the docket of Judge A. Leon Higginbotham, Jr. following his elevation to the Court of Appeals. Although the progress of the case had been slowed by the illnesses and subsequent deaths of two judges to whom the case had previously been assigned, Judge Higginbotham moved the litigation forward vigorously. One of the most important events of Judge Higginbotham's stewardship was the filing of three opinions disposing of the defendants' challenges to jurisdiction and venue, to the constitutionality of the 1916 Antidumping Act, and to the extension of the Robinson-Patman Act to international price discrimination. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 251 (E.D.Pa.1975) (opinion on constitutionality of antidumping act); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 262 (E.D.Pa.1975) (opinion on jurisdiction and venue); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 244 (E.D.Pa.1975) (opinion on application of Robinson-Patman Act).

poration); and two American companies (Sears, Roebuck & Co. and Motorola, Inc.). Fourteen other defendants are subsidiaries of the principal Japanese defendants. Of the twenty-four defendants, fifteen are defendants in both suits, seven in the Zenith action only, and two in the NUE action only.[6] In addition to the twenty-four named defendants, the plaintiffs have identified scores of alleged coconspirators whose business operations traverse the globe, ranging from small Japanese companies to such world industrial giants as N.V. Phillips Gloeilampenfabrieken and General Electric.

In capsule form, plaintiffs' complaints allege that the Japanese defendants and their coconspirators are and have been participants in a conspiracy which, by artificially lowering export prices, has for more than twenty years sought the methodical destruction of the United States domestic consumer electronic products industry.[7] The defendants are accused of carrying out the aims of this conspiracy by flooding the United States market with imported goods at prices so attractive to consumers that domestic producers suffered serious losses, and were either unable to compete or able to do so only by moving some or all of their own production facilities to Mexico and the Far East.[8]

The particular offenses charged in the complaints span the entire range of the antitrust laws. The overall conspiracy is alleged to violate §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 73 of the Wilson Tariff Act, 15 U.S.C. § 8. Plaintiffs also allege actual and attempted monopolization under § 2 of the Sherman Act. Additionally, they allege that the Japanese defendants have violated § 801 of the Revenue Act of 1916, better known as the 1916 Antidumping Act, 15 U.S.C. § 72, by "commonly and systematically," with predatory intent, selling their products in this country for substantially less than their actual market value or wholesale price in Japan. The defendants are also charged with violating the Robinson-Patman Act, 15 U.S.C. § 13(a), by discriminating in price among American purchasers.[9] Finally, Zenith charges that Sears, Motorola, and the Matsushita and Sanyo defendants violated § 7 of the Clayton Act, 15 U.S.C. § 18, in connection with the Japanese companies' acquisitions of interests in domestic consumer electronic products manufacturers.[10] The plaintiffs' papers seek to portray a unitary worldwide conspiracy said to have lasted over a period

---

**6.** Sony Corporation and its sales subsidiary, Sony Corporation of America, were originally named in both suits. However, they were dismissed from the Zenith action after settling with Zenith in April 1977, and are defendants now only in the NUE action.

The seven other principal Japanese defendants are named in both actions, as are eight of their subsidiaries: Matsushita Electric Corporation of America, Toshiba America, Inc., Hitachi Sales Corporation of Japan, Hitachi Sales Corporation of America, Sharp Electronics Corporation, Sanyo Electric, Inc., Sanyo Electric Trading, Inc., and Mitsubishi International Corporation.

Sears and Motorola are named only in the Zenith suit, as are MELCO Sales, Inc., Sanyo Manufacturing Co., Matsushita Electronics Corporation, Matsushita Electric Trading Co., Ltd., and Quasar Electronics Corp., also a Matsushita subsidiary.

**7.** The NUE suit is limited to television receivers; the Zenith complaint also encompasses radios, phonographs, tape and audio equipment, televisions, and electronic components.

**8.** Every major television manufacturer, including Zenith and RCA, now operates production facilities outside the United States.

**9.** The original complaints included counts alleging that price discrimination between Japanese and American purchasers violated the Robinson-Patman Act. These counts were dismissed for failure to state a claim. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 244 (E.D.Pa.1975) (Higginbotham, J.).

**10.** Zenith challenges two acquisitions. The first is the 1974 sale by Motorola of its consumer electronic products division and its "Quasar" tradename to Matsushita. The other is the 1976 acquisition by Sanyo of a majority interest in Warwick Electronics, Inc., a manufacturer of television receivers for sale to U. S. private label customers, the largest of which was Sears. Sears had owned 25% of Warwick's common shares, and after the transactions was 25% owner of Warwick's successor, Sanyo Manufacturing Co. (an American corporation). Zenith alleges that Sears has contracted to purchase 70% of its console color television requirements from Sanyo Manufacturing.

of some thirty years and to have involved approximately one hundred manufacturers, exporters, and importers of consumer electronic products of various national origins.

The defendants maintain that, notwithstanding their voluminous submissions, plaintiffs have failed to elucidate their claims with any degree of precision. They also deny both the legal and factual validity of the plaintiffs' claims. Additionally, certain of the defendants have asserted counterclaims against Zenith, attacking Zenith on two fronts. First, they allege that Zenith, acting alone and in combination and conspiracy with others, engaged in territorial allocations, price discrimination, and horizontal and vertical price fixing arrangements, and effected certain "key dealer preferences" in violation of the Robinson-Patman Act and §§ 1 and 2 of the Sherman Act. Second, they accuse Zenith and its coconspirators of seeking to interfere with its competitors, including the counterclaimants, "by every means available, including the submission of complaints, petitions, testimony and other information to various federal governmental agencies and officials, federal courts, and the United States Congress which were based upon sham, false and misleading allegations and information, without regard to the truth or merits of the claims made." The counterclaiming defendants thus invoke the "sham litigation" theory of antitrust liability recognized in *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).[11]

Pending before us currently are motions by all defendants seeking summary judgment against both Zenith and NUE. Some are joint motions; others are motions by individual defendants, some of which are joined by other defendants; some motions are addressed to discrete legal issues; others are omnibus motions addressed to several issues. These motions, which number several dozen, raise a wide variety of issues, both factual and legal, and may be catalogued as follows: (1) an attack upon subject matter jurisdiction (the motion addressed herein); (2) a motion asserting that NUE lacks standing to sue under the doctrine of *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R.,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), because of its 100% acquisition by the Swedish manufacturer Aktiebolaget Electrolux after the allegedly offending events occurred; (3) a motion contending that Zenith was not directly injured and that it therefore cannot recover under the doctrine of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); (4) a motion (decided this day) asserting that plaintiffs' claim under the Antidumping Act of 1916, 15 U.S.C. § 72, fails because of the lack of required comparability between products sold in Japan and those sold in the United States; (5) a motion asserting insufficiency of evidence of the monopolization and attempted monopolization claims under § 2 of the Sherman Act; (6) a motion asserting insufficiency of the evidence of price discrimination under the Robinson-Patman Act; (7) motions addressed to the claims under § 7 of the Clayton Act, some of which argue that the particular defendants were not involved in any acquisitions, and others of which contest the sufficiency of the evidence; (8) a separate motion by Sony Corporation advancing its allegedly unique position as a manufacturer of higher priced goods, with the resulting implication that it could not have been a member of a conspiracy to sell at artificially low prices; (9) a motion by Sears asserting a statute of limitation defense; (10) a motion by Motorola advancing its allegedly unique status as a victim, rather than a perpetrator, of the acts complained of; and (11) a series of motions addressed to plaintiffs' conspiracy claims alleging, *inter alia,* (a) lack of evidence of conspiracy; (b) insufficiency of the evidence of consciously interdependent parallel behavior, required to prove conspiracy; and (c) that the "check-price agreements" which plaintiffs contend are central to defendants'

---

11. The counterclaims described in the text are asserted by certain of the Matsushita, Mitsubishi, Hitachi, Sharp, Sanyo, and Toshiba defendants. In addition, Sears asserts a counterclaim against Zenith based on the Lanham Act, 15 U.S.C. §§ 1051–1127.

conspiracy were mandated by the Japanese Ministry of International Trade and Industry (MITI) and hence cannot be condemned by the United States antitrust laws under the act of state and sovereign compulsion doctrines, and principles of international comity. Finally, and relevant to the monopolization, dumping, and Robinson-Patman claims, all of which require predatory intent, defendants claim that plaintiffs have shown no evidence of pricing below marginal cost, or its surrogate average variable cost, as required to prove predation under the standard advanced by Professors Areeda and Turner,[12] which defendants maintain applies.

As the foregoing description suggests, this is a case of considerable complexity. It is also a case of monumental proportions. The document production has run to twenty million documents; deposition transcripts run to over 100,000 pages; interrogatories have come in wave after wave—the plaintiffs' answer to one interrogatory ran to 750 pages. Plaintiffs' final pretrial statement, filed with preclusive effect,[13] consumes over 17,000 pages. And yet not even the foregoing description can adequately portray the character of this litigation. It is only when the matrices of complexity and magnitude are superimposed upon the ambience of this case, which has been conducted throughout in the highest of dudgeon and rhetoric and attended by constant acrimony, that its incredible and burdensome nature can be truly assayed. We will have more to say on this point later.[14]

Rather than waiting to file a comprehensive opinion addressing each motion, we have chosen to write separately on each discrete legal issue, whether raised by one motion or by several. Such an approach will be valuable in terms of case management, for it will permit us to narrow the issues in advance of trial, saving further preparation time for the parties. Furthermore, it will allow us to address in a single opinion those legal issues which are common to several motions. We turn now to the matter of subject matter jurisdiction.

As discussed in section III, *infra,* resolution of the subject matter jurisdiction question requires a factual analysis in addition to the legal analysis. Because the factual analysis overlaps with that required for consideration of the conspiracy issue, which is also the subject of summary judgment motions before us, the two factual inquiries will be carried out concurrently.[15] Accord-

---

**12.** *See* Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975).

**13.** The requirement of preclusive final pretrial statements by both plaintiffs and defendants formed the cornerstone of Pretrial Order No. 154, the comprehensive case management order guiding this litigation, which is reprinted at 478 F.Supp. 946 (E.D.Pa.1979). Pretrial Order 154 has since been amended as to deadlines. Defendants' final pretrial statement is now due to be filed in August of 1980, with trial to follow in October. In the final pretrial statements, the parties are required to set forth all facts, including subsidiary and supporting facts, that they intend to prove at trial, keyed to specific witnesses, documents, and depositions, together with a specific enumeration by the plaintiffs of the facts (evidence *aliunde*) by which they intend to prove each defendant's complicity in the alleged conspiracy. As noted in PTO 154, "[b]y this formulation we do not intend that the parties must provide a script for trial. We do, however, intend that the parties set forth in narrative form not just the ultimate facts, but all the facts they will prove, including all subsidiary or supporting facts. In so doing,

they will make, at a minimum, the kind of submission they would make if they were writing detailed requests for findings of fact setting forth what the evidence has established in a nonjury case." 478 F.Supp. at 949.

**14.** For further factual background, *see* the opinions filed by Judge Higginbotham, listed *supra* at n. 5, as well as our opinion on the jury trial issue, *i. e.,* whether plaintiffs' jury trial demand must be stricken on grounds of the complexity of the litigation, *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 478 F.Supp. 889 (E.D.Pa.1979). For factual analysis of the dumping contentions, see the opinion addressing that issue filed this day, 494 F.Supp. 1190 (E.D.Pa.1980).

**15.** Because the admissibility of enormous numbers of critical documents is at issue, our present intention is to hold argument or hearings on evidentiary questions before making our factual analysis, for any disputed question of fact must be raised by admissible evidence. *See* F.R.Civ.P. 56(e).

ingly, in this opinion we address only the purely legal aspects of the subject matter jurisdiction issue, focusing on the question of the extraterritorial reach of American antitrust legislation and defining the elements which must be satisfied for extraterritorial jurisdiction to attach.

Notwithstanding that the subject matter jurisdiction issue is raised only by MELCO,[16] and notwithstanding that this issue gives us little difficulty, we write at some length herein for three reasons. First, as we have already noted, because this is the first of our opinions to address the summary judgment motions, it is an appropriate vehicle through which to set forth the background of the litigation; we will incorporate that background by reference in subsequent summary judgment motion opinions. Second, although the result on the subject matter jurisdiction motion is clear, the extensive case law gives us nothing precisely on point; moreover, there are a number of conceptual problems in determining the appropriate analytical framework for resolution of MELCO's motion which require discussion. Third, because of the importance and magnitude of the case and the vigor with which MELCO asserts the subject matter jurisdiction issue, we feel that MELCO is entitled to complete explication of our reasoning.

One final matter of a preliminary nature must be resolved. MELCO urges that in determining this and other summary judgment motions, we consider only those papers filed as of April of 1979, when argument on the summary judgment motions was heard, and that we not refer to plaintiffs' massive final pretrial statement as we act on the summary judgment motions filed theretofore. We believe, however, that we would be remiss were we to neglect to consider all materials available to us. Indeed, we submit that the grant of summary judgment would not pass muster if factual material such as that in the FPS were ignored. Because of the recurring nature of

MELCO's request, we add the following explanation of our reasons for this aspect of our decision.

MELCO's motion was filed on March 31, 1978. MELCO contends that the summary judgment record was closed with the filing of the last affidavits and briefs in connection with its motion, which occurred in April, 1979. MELCO, citing caselaw, contends that it is *entitled* to disposition of the summary judgment motion on the basis of the record as it then stood, and that it is improper for us to consider the FPS, which was not filed until the fall of 1979. We disagree.

■ The cases cited by MELCO in support of its view that we should not consider plaintiffs' FPS do not persuade us. *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979), *permits* early decision of summary judgment motions as a remedy for abusive use of discovery, but certainly does not *require* such consideration. *Denckla v. Maes*, 313 F.Supp. 515 (E.D.Pa.1970), is distinguishable on the ground that plaintiff had filed no counter-affidavits to meet defendant's denials, resting instead on the allegations of the complaint and the affidavit filed therewith. *Engelhard Industries, Inc. v. Research Instrumental Corp.*, 324 F.2d 347 (9th Cir. 1963), *cert. denied*, 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed.2d 215 (1964), held only that a district judge did not err in refusing to consider affidavits filed with an application for rehearing, *after* decision of the summary judgment motion. *Accord, Southern Rambler Sales, Inc. v. American Motors Corp.*, 375 F.2d 932 (5th Cir.) *cert. denied*, 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967). The cases are clear that the choice of materials to be considered in conjunction with a summary judgment motion is within the discretion of the trial judge. It is our view that the case management powers accorded to federal trial judges under Federal Rule of Civil Procedure 16 are *controlling* in this regard.

---

**16.** MELCO Sales' motion for summary judgment, filed together with MELCO's and supported by the same brief, does not rest on subject matter jurisdictional grounds, and will therefore not be considered at this time.

██ We cannot say how we would exercise our discretion respecting MELCO's argument that we decide the case on the April 1979 record if this were an ordinary or even a moderately involved case. However, what we have here is a case whose colossal dimensions and unique chemistry render it qualitatively different from the cases which MELCO has cited, and indeed from all but a few cases in the annals of litigation. We have discussed the complexity and magnitude of the case *supra*. In terms of chemistry, suffice it to say that the case has been attended, through much of its course, by constant acrimony, recriminatory rhetoric, and a significant failure of the parties to cooperate or stipulate to anything, even routine matters such as extension of deadlines.[17] The chemistry of the case has tainted the discovery proceedings and compounded already serious problems with the adequacy of discovery. More importantly, the FPS was in not insignificant measure required as a surrogate for incomplete discovery. As will be seen, all of these matters have impacted upon the exercise of our challenged discretion.

When this case was assigned to our docket in November of 1977, discovery was essentially in midstream. As note 17 *supra* suggests, accomplishing the completion of discovery, through direct or surrogate means, was a major undertaking. Regrettably, at the time that MELCO submits that the record on its summary judgment motion should have been closed, there still was much discovery outstanding, either in its conventional sense [17A] or in its surrogate sense, *i. e.*, completion of the FPS. Given the magnitude of the case, the chemistry of the case, and the problems with completion of discovery, it is our considered judgment that to treat the summary judgment record as closed as of April 1979 would be foolhardy.

Let us consider the following examples. Assume that we were to grant summary judgment for one of the defendants on the basis of the April 1979 record. Would not plaintiffs assail that grant mightily in the Court of Appeals, if but a modest amount of material surfaced after the proffered date and found its way into the FPS? Consider, on the other hand, the "dumping" issue on which summary judgment has been granted this day. Are not the opinion and accompanying order granting summary judgment to the defendants, including MELCO, on plaintiffs' dumping claims bottomed on a much more solid foundation than they otherwise would be by virtue of our having considered the model match-ups, expert opinion reports, and the FPS, all of which were filed after April 1979, with respect thereto? Indeed, it was not until the FPS was filed with preclusionary effect

17. As we noted in a recent answer to a petition for writ of prohibition or mandamus which was denied by the Court of Appeals on January 17, 1980:

Even routine matters such as extension of deadlines all too frequently have involved my personal intervention; I have resolved literally hundreds of problems involving scheduling of depositions, deadlines for production of documents and responses to interrogatories, etc.

These routine problems have come to my attention at the regular day-long pretrial conferences, through correspondence (I receive on the average 15 letters a week from counsel), and through a program of telephone conference calls which are reported by a court reporter and are designed to provide a forum for adjudication of case management problems on an expeditious basis. Over the past few years, there has never been a week without two or three conference calls, often quite lengthy, and often with as many as 20 to 25 lawyers involved. The 110 reported pretrial conferences and conference calls which have taken place between January 1978 and May 1979 only tell part of the story, for there have been many calls unreported by the court reporter. Symbolic of the problem is the fact that the parties were not even able to agree on English language translations of Japanese language documents. I have had to appoint special translation masters to troubleshoot in the area, and I still have had to hold half a dozen conferences devoted to the translation problem. In sum, for the first year and a half of my stewardship in this case, I probably devoted close to fifty percent of my time to superintendence of this case.

17A. *Inter alia*, many thousands of document pages requested by the plaintiffs were not produced by various defendants until well after April 1979.

that the plaintiffs' case, subject to the good cause exception of Pretrial Order No. 154, was "cast in concrete," as it were.

In sum, we believe that we would tarnish our stewardship in this litigation were we to have failed to consider the FPS in connection with the MELCO summary judgment motion. We thus decline to exercise our discretion to treat the summary judgment record as closed as of April 1979.

## II. *THE CONTENTIONS OF THE PARTIES*

MELCO has submitted an omnibus motion, much of which resembles a traditional summary judgment motion, arguing that there is no evidence to support plaintiffs' contentions. However, throughout its arguments, MELCO has interwoven the threshold issue of subject matter jurisdiction.[18] As to that issue, MELCO's arguments are both legal and factual. It maintains, first, that the United States antitrust laws, principally the Sherman Act, cannot be stretched to cover acts occurring outside the territorial boundaries of the United States by foreign nationals, and that the actions of MELCO were all of that character. Secondly, it argues that, even if the Sherman Act were intended to reach such activities, the actions of MELCO do not rise to a level which would meet the jurisdictional test.

More specifically, MELCO argues that it is a Japanese company which sold its products solely in Japan, maintaining no American presence, and that therefore any operative acts in furtherance of the alleged conspiracy by which plaintiff seeks to bring MELCO into the action could have occurred only in Japan.[19] It then strongly presses an absolute territorial doctrine of jurisdiction, maintaining that reports of the demise of *American Banana Co. v. United Fruit Co.,*

213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), which is said to posit that doctrine, are highly exaggerated, and that *American Banana*, rather than *United States v. Aluminum Co. of America (Alcoa)*, 148 F.2d 416 (2d Cir. 1945) (L. Hand, J.), is the law. Therefore, according to MELCO, the United States antitrust laws cannot be applied to it.

MELCO further argues that, even if *Alcoa* is the law in some respects, the "intent plus effect" test announced there by Judge Learned Hand, *see infra* at 1182–1184, dubbed the "qualified" test by MELCO, applies only when (1) the actor is a U.S. national, (2) all or part of the activities occurred in or were controlled from the United States, or (3) a combination of those factors. Conspicuously absent from the case law, it contends, are situations in which the *Alcoa* test has been applied to reach actions by foreign nationals which occurred on foreign soil. Thus, finding no specific overruling of *American Banana's* broad language implying an absolute territorial principle of subject matter jurisdiction, MELCO argues that that case controls, despite frequent commentary to the contrary. *See, e. g.*, 1 P. Areeda & D. Turner, *Antitrust Law* 261 (1978).

Turning to constitutional arguments, MELCO maintains that the doctrine of separation of powers demands that the courts not assume jurisdiction over foreign commerce, an area plainly allocated to the legislative and executive branches of government, unless there is some compelling reason; plaintiffs have adequate remedies, MELCO urges, in the procedures, both administrative and diplomatic, established by those non-judicial branches. Furthermore, it argues that the Sherman Act and the 1916 Antidumping Act do not delegate con-

---

**18.** MELCO also later filed a motion to dismiss under Federal Rule of Civil Procedure 12 based upon the same subject matter jurisdiction grounds as are used to support its summary judgment motion. See the discussion relating to this procedural problem, section III, *infra.*

**19.** Plaintiffs contend that Judge Higginbotham, in his opinion concerning personal jurisdiction and venue, *see* note 5 *supra*, already decided

this issue, and that MELCO is plainly doing business in this country. We are not convinced that the issues are identical, however, and will not restrict our scrutiny of the record to the "minimum contacts" required for personal jurisdiction. *See International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

trol over foreign commerce to private citizens, and that a private damage action in this context may not be maintained.

As will be seen *infra*, the state of the law renders MELCO's positions untenable; hence the cornerstone of MELCO's thesis is that it is simply bad policy to extend United States antitrust jurisdiction to foreigners acting abroad. The United States must recognize, MELCO urges, that under the "law of nations" concept which it espouses, by which we assume it means those standards of conduct that have come to be accepted as customary in international relations, there is no analogue of the Sherman Act making economic matters punitively actionable, *i. e.*, there is no universal recognition that the actions which the United States antitrust laws interdict are or should be serious offenses. Therefore, the argument runs, it is unfair to hold an alien corporation liable for actions undertaken in its home country which were perfectly legal there.

MELCO cites numerous commentators for support, but, significantly, little law. This viewpoint is epitomized in MELCO's final brief, its "Supplemental Brief of Defendants Mitsubishi Electric Corporation and Melco Sales, Inc. with Respect to Subject Matter Jurisdiction," filed April 23, 1979, in which we are asked to ignore the welter of precedent and write on "*tabula rasa*" concerning this issue, which is "so fraught with such overriding considerations as national sovereignty, the conduct of foreign relations, and world trade," Supplemental Brief at 2, and to dismiss as to defendant MELCO for reasons of comity.

Finally, MELCO maintains that even if the *Alcoa* test were to prevail, its activities, all of them allegedly in Japan, must be tested by some obscure higher threshold of jurisdictional proof, again because the "law of nations" so requires. As to factual issues, MELCO maintains that it has committed no acts which would bring it within the subject matter jurisdiction of the United States antitrust laws under any standard which may be applied.

The plaintiffs rejoin that the law supports their position that *American Banana* has been entirely undermined, though concededly never explicitly overruled, that the *Alcoa* test plainly reigns, and that it is easily met with respect to MELCO, at least insofar as the low threshold required for subject matter jurisdiction is concerned. They urge in addition that comity considerations do not require that the court refrain from finding jurisdiction in this case. Finally, plaintiffs maintain that they have brought forth evidence more than sufficient to implicate MELCO in the massive conspiracy which they have alleged, hence to subject it to the jurisdiction of this court.

In the following sections, we will discuss those of the parties' contentions which raise strictly legal issues. For purposes of this opinion, we will assume that MELCO does not maintain an agent in this country, and that, as argued so strenuously by MELCO, the only acts with which it could possibly be charged occurred in Japan.[20] Nonetheless we will reject MELCO's "absolute territorial" doctrine of jurisdiction and find that the American antitrust laws may be applied to these actions.

## III. PROCEDURAL CONSIDERATIONS

As a threshold matter, we must determine the appropriate procedural mechanism for disposing of MELCO's motion. As we have pointed out, MELCO disputes that any of its activities had any effect on United States interstate or foreign commerce. Because, in Sherman Act cases, the existence of a nexus with interstate or foreign commerce is both a jurisdictional prerequisite and an element of the substantive claim,[21] the jurisdictional and substantive challenges raised in the motion are neces-

**20.** *See* note 19 *supra*.

**21.** Although the requirement that activities be "in commerce" or that they "affect" interstate or foreign commerce is always said to be a prerequisite for federal jurisdiction under the Sherman Act, *see e. g., McLain v. Real Estate*

*Board, Inc.*, 444 U.S. 232, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980); *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 742 n. 1, 96 S.Ct. 1848, 1851 n. 1, 48 L.Ed.2d 338 (1976); *Gulf Oil Corp. v. Copp Paving Co.*, 419

sarily intertwined. This partial identity of issues, when linked with the fact that subject matter jurisdiction can never be waived and can be raised at any time, even after trial, raises questions as to the appropriate procedural hatrack upon which to hang a decision, the identity—judge or jury—of the ultimate jurisdictional decisionmaker, and the level of proof required for a final jurisdictional determination. While we believe it is clear that the court decides the jurisdictional question and that the level of

U.S. 186, 203 n. 19, 95 S.Ct. 392, 402 n. 19, 42 L.Ed.2d 378 (1974); *Harold Friedman, Inc. v. Thorofare Markets, Inc.*, 587 F.2d 127, 132 n. 14 (3d Cir. 1978), it is unclear why this is so. The Sherman Act provides that "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1. Federal jurisdiction over antitrust disputes is provided by 28 U.S.C. § 1337, which grants jurisdiction to the district courts over all actions "arising under an Act of Congress regulating commerce." 28 U.S.C. § 1337. Because it is well established, at least in this Circuit, that "[t]he tests of 'arising under' required by Section 1337 are the same as those demanded by Section 1331, [the general federal question jurisdictional grant, which contains the same "arising under" language] except that no jurisdictional amount need be alleged," *Jersey Central Power & Light Co. v. Local Unions 327, etc., IBEW*, 508 F.2d 687, 699 n. 34 (3d Cir. 1975), *vacated on other grounds*, 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976), it would seem that the only question which would be relevant for jurisdictional purposes is whether the allegations state a cause of action "arising under" the Sherman Act. The test whether a claim arises under a given statute is a lenient one, permitting dismissals for lack of jurisdiction only if the allegations of the complaint are frivolous or on their face do not implicate a federal statute. *See, e. g., Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Where a plaintiff has made non-frivolous allegations of a violation of the Sherman Act, federal court jurisdiction should attach and the court should be "empowered to determine whether the claim is good or bad, on the basis of a motion to dismiss for failure to state a claim or cause of action." *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 359, 79 S.Ct. 468, 473, 3 L.Ed.2d 368 (1959). If a claim were not adequately alleged, the action would be dismissed on the merits. *Bell v. Hood, supra.*

This jurisdiction-based analysis, however, has not been articulated by the courts, which have instead consistently looked to the language of the Sherman Act, the substantive statute, for further jurisdictional guidance, interpreting the effect on interstate or foreign commerce element as a jurisdictional requirement. It appears that this concept derives from the fact that Congressional power to legislate in this manner is limited by the Commerce Clause of the Constitution. The question remains, however, whether this constitutional limitation on legislative jurisdiction also applies to judicial jurisdiction. The argument for applying the same restrictions would seem to be that judicial application of legislation beyond its permissible constitutional reach would in effect extend legislative power in an unconstitutional manner. On the other hand, however, it is clear that the jurisdiction of the courts is not necessarily coextensive with that of Congress. Thus, the courts are constitutionally empowered to hear cases involving parties from different states, but federal law is not controlling. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Additionally, it has been settled since *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), that the courts have jurisdiction to determine the constitutionality of federal legislation. This power clearly entails the extension of judicial jurisdiction where legislative jurisdiction does not exist.

Logically, then, in the Sherman Act context, the lack of a nexus with interstate commerce should be treated as a failure to state a claim under the Act, and not as a jurisdictional defect. This would sufficiently limit the reach of the Sherman Act, for a complaint failing to allege an interstate commerce nexus would be dismissed on a 12(b)(6) motion for failure to state a claim. On the other hand, the plaintiff would clearly have an adequate opportunity to prove this interstate commerce nexus, because cases involving disputed issues of fact would proceed to the trial stage. The parties' right to a jury trial would likewise be protected.

As noted above, this jurisdictional analysis has not been adopted by the federal courts, hence we cannot break with well-established precedent by adopting it here. However, we have found this analysis helpful in considering the appropriate *modus procedendi* in this area. We note additionally that, while the "arising under" approach would resolve or eliminate many of the procedural problems discussed below, that approach would have its limitations in a situation in which the jurisdictional and substantive requirements are *truly* intertwined. See discussion *infra* related to claims brought, *e. g.*, under 42 U.S.C. § 1983, where the element of state action is present in the jurisdictional provision as well as in the substantive section. Hence, the problems which face the federal courts—arguably needlessly—in Sherman Act cases must still be faced in other contexts.

proof is a modest one, we nonetheless extend our opinion by a few pages to draw attention to the confused and anomalous state of the law in this area, in the hope that future commentary and judicial decision may ultimately provide clarification.

Two fundamental philosophies are placed at odds by this potential procedural snarl: (1) the basic principle that jurisdiction is a threshold question requiring resolution by the court at the outset of any litigation, because in its absence the court has neither statutory nor constitutional authority to proceed to adjudicate the merits of a dispute; and (2) the right to trial by jury, or at least a decision by a factfinder, unless it is clear as a matter of law that there is no provable set of facts on which relief could be granted. Moreover, where the jurisdictional and substantive questions are intertwined in some degree and a finding of fact at trial results in a deprivation of jurisdiction, the entire purpose of pretrial disposition of jurisdictional matters is defeated. We have looked in vain for a definitive discussion of this problem, which surfaces in a number of contexts.[22] While this may not be a subject for codification or synthesis, we deem it worthy of discussion.

The Supreme Court has stated that it is irrelevant whether the question is deemed one of jurisdiction or one of substance since in either case the critical inquiry would be the same, *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 742 n. 1, 96 S.Ct. 1848, 1851 n. 1, 48 L.Ed.2d 338 (1976). That pronouncement, however, is of little succor for the trial judge. In *Hospital Building*, the Court reversed a dismissal on the pleadings, holding that there were sufficient allegations to support jurisdiction at that stage. See note 24 *infra*. It was thus

unnecessary for the Supreme Court to consider, as the trial judge must, how this "critical inquiry" is to be answered—*i. e.*, by whom, at what stage of the proceedings, on what evidence, and by what standard of proof.

The Supreme Court's most recent discussion in this area appears in *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), which involved allegations of a price-fixing conspiracy by real estate brokers and several real estate trade associations. Finding an insufficient nexus with interstate commerce, the district court had granted defendant's motion to dismiss for failure to state a cause of action under Federal Rule of Civil Procedure 12(b)(6). The Fifth Circuit Court of Appeals affirmed the dismissal, but styled it a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1). The Supreme Court, determining that "it cannot be said that there is an insufficient basis for petitioners to proceed at trial to establish Sherman Act jurisdiction," 100 S.Ct. at 510, vacated and remanded for further proceedings.

Although the *McLain* court discussed the interstate commerce element of Sherman Act claims in jurisdictional terms, it concluded in cause of action (12(b)(6)) terms,[23] and was less than clear about whether it was making a jurisdictional or substantive decision. Quoting the oft-cited rule of *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) that "a complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,'" *id.* at 511, the court held that the "rule applies

---

**22.** *See, e. g., Gilbert v. David*, 235 U.S. 561, 35 S.Ct. 164, 59 L.Ed. 360 (1915) (diversity); *Nelson v. Keefer*, 451 F.2d 289 (3d Cir. 1971) (jurisdictional amount); *Robinson v. Bergstrom*, 579 F.2d 401 (7th Cir. 1978) (state action); *Flaherty v. Matlack, Inc.*, No. 77–1805 (E.D.Pa. Jan. 7, 1980) (Van Artsdalen, J.) (diversity); *Hersh v. Department of the Navy*, 456 F.Supp. 227 (E.D.Pa.1978) (exhaustion of administrative remedies under Title VII); *Fannie v. Chamberlain Mfg. Corp.*, 445 F.Supp. 65

(W.D.Pa.1977) (existence of notice of right to sue letter from EEOC in sex discrimination case); *Stephens v. Melson*, 426 F.Supp. 1022 (D.Del.1977) (jurisdictional amount).

**23.** The Court also read the pleadings in the light most favorable to the plaintiffs, 100 S.Ct. at 511, a procedure not generally followed when a court is dealing with a jurisdictional challenge. *Mortensen v. First Federal Savings & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

with no less force to a Sherman Act claim, where one of the requisites of a cause of action is the existence of a demonstrable nexus between the defendants' activity and interstate commerce." *Id.* Finally, however, the court decided that the evidence on the record "shows a sufficient basis for satisfying the Act's jurisdictional requirements." *Id.*

Although *McLain* is thus unclear as to the procedural questions involved, the Supreme Court did nonetheless discuss the case as involving a jurisdictional question and offered some guidelines for trial courts. First, the Court indicated that preliminary pretrial determinations of the commerce nexus rest on a lesser showing than determinations of the same question at trial. Thus, in vacating the lower court's dismissal, the Court held that "on the record thus far made, it cannot be said that there is an insufficient basis for petitioners *to proceed at trial to establish Sherman Act jurisdiction.*" 100 S.Ct. at 510 (emphasis added). The Court thereby appears to have created a two-step jurisdictional inquiry—first at a pretrial stage, and then again at trial when the standard of proof will apparently be higher. With regard to the test to be employed at the pretrial stage, the Court noted

that federal jurisdiction may be established upon allegations that the challenged conduct has an interrelationship with a specified aspect of interstate commerce. If the allegations are controverted, the plaintiff "must proceed to demonstrate by submission of evidence beyond the pleadings either that the defendants' activity is itself in interstate commerce or . . . that it has an effect on some other appreciable activity demonstrably in interstate commerce." *Id.* 100 S.Ct. at 509. Hence, it is clear that the trial court is not bound to accept allegations in the pleadings, but it is unclear what standard of proof it should impose on the plaintiff who must submit further evidence.[24]

The Third Circuit provides only slightly more guidance. In *Mortensen v. First Federal Savings & Loan Ass'n*, 549 F.2d 884, 892 (3d Cir. 1977), the court posited that "because the nexus [plaintiffs] will have to establish to succeed on the merits is at least in part the same nexus they must allege or even prove to withstand jurisdictional attacks, . . . we feel it is incumbent upon the trial judge to demand less in the way of jurisdictional proof than would be appropriate at a trial stage."[25] Subse-

24. Two other recent Supreme Court cases warrant discussion here. In *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), the Court was unconcerned whether the interstate commerce question was treated as a question of jurisdiction or as a substantive element of the offense, but chose to follow the court of appeals and treat it as an element of the claim, noting that the analysis would be no different. *Id.* at 742 n. 1, 96 S.Ct. at 1851 n. 1. Because the court determined that the complaint sufficiently alleged a substantial effect on interstate commerce for purposes of withstanding a 12(b)(6) motion, it did not have to address the possibility of a lower standard for jurisdictional purposes. Moreover, because the case had been appealed from a dismissal at the pretrial stage, the jury trial issue was not implicated. The court did point out that "(i)t may, of course, be that even though petitioner's complaint adequately alleges an effect on interstate commerce, further proceedings in this case will demonstrate that respondents' conduct in fact involves . . . no substantial effect on interstate commerce." *Id.* at 747 n. 5, 96 S.Ct. at 1853 n. 5. Left unclear by this comment, how-

ever, was whether this later demonstration would oust the court of subject matter jurisdiction, or merely oust the plaintiffs from federal court by an adverse decision on the merits.

The previous term, in *Goldfarb v. Virginia State Bar Ass'n*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court considered the question of a nexus with interstate commerce with no reference whatsoever to subject matter jurisdiction.

Early Supreme Court cases construing the reach of the Sherman Act in cases with a disputed interstate commerce nexus similarly did not address the judicial jurisdiction question, discussing instead the extent of Congressional power. *See, e. g., Swift & Co. v. United States*, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *United States v. E. C. Knight Co.*, 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325 (1895).

25. In *Mortensen*, plaintiffs were mortgagors who brought suit against their mortgagee and the mortgagee's law firm, alleging an illegal tie-in of legal services in violation of § 1 of the Sherman Act. The question on appeal was whether the district court had erred in dismissing the action for lack of subject matter juris-

quently, a district court applying the *Mortensen* standard, noting first that the general consensus of the circuit courts has been to disfavor early dismissals of Sherman Act claims unless "the relation of the subject to interstate commerce and its effect upon it are clearly nonexistent," concluded that the complaint's allegations of an interstate commerce nexus were sufficient in and of themselves to show a substantial effect on interstate commerce. *DeGregorio v. Segal*, 443 F.Supp. 1257, 1266–68 (E.D.Pa.1978) (quoting *A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Ass'n*, 484 F.2d 751, 759 (7th Cir. 1973), *cert. denied*, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974)).

■ Whether that decision comports with the Third Circuit's intentions is problematical, for while both the Supreme Court and the Third Circuit envision a bifurcated jurisdictional determination, neither has offered concrete guidelines for the procedure which the trial court should follow or the level of proof it should require, leaving us with a sketchily delineated path. It is clear, however, that the level of proof required for a pre-discovery jurisdictional finding is a low one indeed, and that prema-

ture dismissal of a Sherman Act case for lack of subject matter jurisdiction is disfavored.[26]

More difficult questions arise as we proceed down the procedural path. Is there a different standard at the summary judgment stage? What if, as in the case at bar, summary judgment is considered on a voluminous record?[27] At the trial stage, is jurisdiction still challengeable on the ground that the demonstrated nexus with interstate commerce has been shown to be insubstantial?[27A] Or, given the fact that the same interstate commerce requirement is an element of the Sherman Act offense, should this question be treated as going to the merits? In either case, must it be submitted to the jury or can the court resolve the dispute? If the court decides that the jurisdictional question—the nexus with interstate or foreign commerce—has been proven, does the same question go to the jury in its "substantive" role? If not, have the parties been deprived of their constitutional right to a trial by jury?

Perhaps most perplexing is the role of the jury in jurisdictional matters. The question is rarely considered because cases implicating it are generally appealed from pretrial

diction on the grounds that the alleged tie-in was neither in nor substantially affected interstate commerce. The Third Circuit vacated the dismissal, holding that plaintiffs had alleged an interstate impact sufficient to withstand a pretrial motion to dismiss.

*Mortensen's* primary value is in its detailed clarification of the formal, procedural differences between treatments of motions under Fed.R.Civ.P. 12(b)(1), 12(b)(6), and 56, 549 F.2d at 890–92, a discussion which need not be repeated here. At one point, the court notes that when a trial court is considering its jurisdiction under 12(b)(1), it

is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*Id.*

This statement will be helpful in some contexts, but not in those addressed at pp. 1175–1177 *infra*.

While the *Mortensen* court found that the jurisdictional and substantive issues were so intertwined as to preclude permissible pretrial reso-

lution, a later Third Circuit case makes it clear that certain questions can clearly be denominated as jurisdictional and others as substantive. The court explained that the only jurisdictional question is whether there is a "material effect on interstate commerce." *Harold Friedman, Inc. v. Thorofare Markets, Inc.*, 587 F.2d 127, 132 (3d Cir. 1978). The question whether defendant's conduct caused a *restraint* of trade or commerce falls squarely within the substantive portion of the Sherman Act. *Id.* at 137.

**26.** *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Mortensen v. First Federal Savings and Loan Ass'n*, 549 F.2d 884, 896 (3d Cir. 1977).

**27.** *See* note 13, *supra*, and accompanying text.

**27A.** It should be noted that a decision against plaintiff on the merits would not have an identical effect as would a decision based on jurisdictional grounds, because of the potential effect on the court's ability to hear pendent claims.

dismissals for lack of jurisdiction. The Ninth Circuit, however, when confronted with the argument that the pretrial dismissal of a claim involved resolution of a factual dispute which should have been submitted to a jury, posited that "a party is entitled to have the jurisdictional issue submitted to a jury only where the jurisdictional issue and the issue on the merits are factually so completely intermeshed . . that 'the question of jurisdiction is dependent on decision of the merits'." *Berardinelli v. Castle & Cooke, Inc.*, 587 F.2d 37, 38–39 (9th Cir. 1978). Since the jurisdictional and factual issues were determined to be separate and distinct, the court held that there had been no violation of the right to a trial by jury. *Id.* at 39.

A similar result was reached in *Evans v. S. S. Kresge Co.*, 394 F.Supp. 817 (W.D.Pa. 1975), *aff'd on other grounds*, 544 F.2d 1184 (3d Cir. 1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977), which held that the question of jurisdiction is triable to the court if "reasonably separable from the substantive allegations." *Id.* at 832. The Third Circuit explicitly failed to reach the issue, 544 F.2d at 1190 n. 1, having found the district court's dismissal for lack of subject matter jurisdiction to be in error, but ultimately affirming the dismissal on the merits.

In a diversity case, the Supreme Court held a jury trial on the issue of citizenship for diversity jurisdiction purposes to be discretionary with the trial judge, *Gilbert v. David*, 235 U.S. 561, 35 S.Ct. 164, 59 L.Ed. 360 (1915), and Judge Van Artsdalen of this court recently submitted that issue to a jury. *Flaherty v. Matlack, Inc.*, No. 77–1805 (E.D.Pa. Jan. 7, 1980).[28] In other contexts, the Third Circuit has upheld trial courts which submitted jurisdictional issues to a jury,[29] and has noted that standards of proof for jurisdictional showings are generally modest out of concern over potential deprivation of the right to a jury trial.[30] On the other hand, a trial court's early dismissal of an action for failure to meet the jurisdictional amount was upheld, despite plaintiff's argument that pretrial dismissal deprived him of his right to a jury trial. *Nelson v. Keefer*, 451 F.2d 289 (3d Cir. 1971).[31]

It appears, then, that the law in this area is a patchwork. The precedents, while clear, are discrete and self-contained, and appear not to have diluted the conventional understanding that subject matter jurisdictional determinations, even where factual findings are involved, are for the court. *See, e. g., Mortensen, supra.* However, when the jurisdictional and substantive issues become intertwined, consideration by a jury may become optional in the court's discretion. *See, e. g., Mortensen, supra. But see Gilbert v. David, supra,* making diversity of citizenship jurisdictional find-

**28.** *See also McNello v. John B. Kelly, Inc.*, 283 F.2d 96 (3d Cir. 1960).

**29.** *See, e. g., Mroz v. Dravo Corp.*, 429 F.2d 1156, 1165 (3d Cir. 1970) (court held preliminary trial before jury regarding jurisdictional issue of whether plaintiff was member of a crew of a vessel and whether that vessel was then in navigation); *Wade v. Rogala*, 270 F.2d 280, 285 (3d Cir. 1959) ("necessary choice, except in the flagrant case, where the jurisdictional issue cannot be decided without the ruling constituting at the same time a ruling on the merits, is to permit the cause to proceed to trial") (amount in controversy). *Cf. Gaskins v. Tarpley*, 456 F.2d 1149, 1151 (3d Cir. 1972) (per curiam) (issue of jurisdiction tried separately to the judge by agreement of the parties).

**30.** *See, e. g., Jaconski v. Avisun Corp.*, 359 F.2d 931, 935 (3d Cir. 1966) (amount in controversy); *Wade v. Rogala*, 270 F.2d 280, 285 (3d Cir.

1959). *See also Schramm v. Oakes*, 352 F.2d 143, 149 (10th Cir. 1965) (personal jurisdiction); *Fireman's Fund Ins. Co. v. Railway Express Agency, Inc.*, 253 F.2d 780 (6th Cir. 1958) (amount in controversy).

**31.** To further demonstrate the checkered character of the law in this area, we pose the following query. Suppose that a judge in a *Nelson v. Keefer* situation made a pretrial ruling (on the basis of the discovery record) that plaintiff's claim in a personal injury case with conceded liability appeared "to a legal certainty" to be in excess of $10,000. Let us further suppose that the jury returns a verdict on damages of $250. We think that no one would contend that the plaintiff could not collect the $250 because there was no federal jurisdiction, *i. e.*, the $10,000 jurisdictional amount had not been met.

ings appropriate for jury consideration even though the jurisdictional and substantive matters are unrelated. While in the context of a case such as a civil rights action where "state action" is an element of both the substantive claim, 42 U.S.C. § 1983, and the jurisdictional basis, 28 U.S.C. § 1343(3), a judge may be unlikely to dismiss for want of subject matter jurisdiction knowing that the jury would have to reach the same question on the merits, the possibility of 12(b)(1) dismissal might make demands for jury trials on the intertwined question frequent, further complicating the law in this area.

By way of final observation, we rescribe our earlier thought that this area is troublesome, not just because of the checkered character of the caselaw, but also because the cases which countenance or require the postponement of jurisdictional decisions until trial are at odds with the generally accepted principle of modern case management that jurisdictional challenges should be disposed of at an early stage of the litigation.

■ We hope that the foregoing discussion will be helpful to judges and scholars dealing with these problems and that in due course clearer principles will emerge. Fortunately, we need not resolve these difficult issues here, for in this case, complicated as it is by the question of extraterritorial application of the antitrust laws, the jurisdictional and substantive issues are sufficiently distinct that the jurisdictional determination is plainly in the province of the court. As defined in section IV, *infra*, the jurisdictional elements in this action include intent to affect U.S. commerce, an actual effect on that commerce, and a determination that factors of international comity do not require that the court decline to exercise its jurisdiction. By way of contrast, substantive violations of the Sherman Act require a showing that defendants' actions constituted a restraint of trade or monopolization "in commerce" or that they "substantially

effect" interstate or foreign commerce. Comity is not a factor. *See Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). We turn, then, to the standard of proof required.

■ It is clear from the few cases which have addressed the issue that the standard is a modest one, significantly lower than the level of proof required for substantive issues at trial.[32] *See, e. g., Mortensen, supra,* 549 F.2d at 897. We see no reason why this standard should not be the same whether the jurisdictional and substantive issues are distinct or intertwined. Even at the summary judgment stage, examining a full record, the standard of proof for the jurisdictional determination is apparently a low one—at least none of the appellate cases cited above suggest otherwise. Therefore, we reject MELCO's high threshold contention as lacking in foundation and hold that, when we reach the factual aspects of the subject matter jurisdiction issue, *see* 1167–1168, *supra,* the matter will be for the court (not a jury), and that a high standard of proof will not be required to establish jurisdiction.

## IV. THE EXTRATERRITORIAL REACH OF THE ANTITRUST LAWS

### A. Introduction

The extraterritorial application of the Sherman Act, and of other United States regulatory legislation as well, has been the subject of prolific commentary for many years. A representative sampling of writings on the issue can be found in Raymond, *A New Look at the Jurisdiction in Alcoa,* 61 Am.J.Int'l L. 558, 558 n. 3 (1967). That scholarly debate centers, however, on questions which are ultimately ones of policy rather than of law. No matter how persuasive the arguments of MELCO may be, (including the arguments of the commentators which they adopt), they are addressed to the wrong forum. For it is not for us to become involved in questioning the proprie-

---

**32.** Indeed, the Ninth Circuit permits dismissal for lack of subject matter jurisdiction "only when the allegations of the complaint are frivo-

lous." *Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597, 602 (9th Cir. 1976).

ty of extraterritorial jurisdiction; we must, instead, examine what the *law* is, as promulgated by Congress and as interpreted by our judicial system.

We will address extraterritorial jurisdiction in terms of the Sherman Act, for it is in that context that the matter has been most frequently litigated.[33] The parties did not separately argue the extraterritorial reach question under the other statutory provisions involved in this litigation, namely, § 7 of the Clayton Act, 15 U.S.C. § 18, § 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), the Wilson Tariff Act, 15 U.S.C. § 8, and the Antidumping Act of 1916, 15 U.S.C. § 72. Because we believe that the issues with respect to the extraterritorial application of American economic regulation are the same regardless of the particular statute being applied, we will likewise refrain from extended discussion of those additional bases for jurisdiction at this time.[34] Of course, the factual requirements under each provision will differ, and will be extensively covered when we reach the factual portions of the jurisdictional determination.[35]

### B. Basic Principles of International Law

 Because MELCO relies so heavily upon the concept of the "law of nations," we believe it would be useful to begin our analysis by outlining some basic principles of international law. Essentially, international law is a body of consensual principles which have evolved from the customs and practices civilized nations utilize in regulating their relationships. These customs have great moral force, and are often cited approvingly by domestic courts. The United States, for example, adheres to the frequently quoted view that "[i]nternational law is part of our law," *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900). However, international law must give way when it conflicts with or is superseded by a federal statute or treaty, made supreme under Article VI of the Constitution, to the extent permitted by the due process clause of the Fifth Amendment. See *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1334 (2d Cir. 1972).[36] It is therefore possible that the United States might find it necessary, in order to enforce domestic law, to violate international principles. In order to avoid

---

**33.** Extraterritorial application of United States economic legislation has also been extensively litigated under the securities laws. *See, e. g., Bersch v. Drexel Firestone, Inc.* 519 F.2d 974 (2d Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir.), *rev'd en banc*, 405 F.2d 215 (2d Cir. 1968), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972); *IIT v. Vencap, Ltd.* 519 F.2d 1001 (2d Cir. 1975); *SEC v. Kasser*, 548 F.2d 109 (3d Cir. 1977).

**34.** Section 7 of the Clayton Act applies to corporations "in commerce" or subject to the jurisdiction of the Federal Trade Commission who acquire assets of other corporations when the effect is "substantially to lessen competition" or to "tend to create a monopoly." 15 U.S.C. § 18. The Robinson-Patman Act prohibits price discrimination by "any person engaged in commerce, in the course of such commerce . . . where either or any of the purchases involved . . . are in commerce" and where the effect is "substantially to lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 13(a). The Antidumping Act of 1916 applies to "any per-

son importing or assisting in importing" articles into the United States, 15 U.S.C. § 72. The Wilson Tariff Act applies to combinations between persons "engaged in importing any article from any foreign country into the United States" when the combination "is intended to operate in restraint of lawful trade . . . ." 15 U.S.C. § 8. Jurisdiction under all these statutes is based on 28 U.S.C. § 1337, which reads:

"The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

**35.** The legal standards under the Clayton and Robinson-Patman Acts are somewhat narrower than under the Sherman Act: under those statutes, the "in commerce" provision, *see* note 34, *supra*, does not extend to activities which merely "affect" commerce, *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). To that extent, the ultimate factual inquiry will differ.

**36.** *See Schooner Exchange v. McFadden*, 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812).

such conflict to the extent possible, it has been said that "an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains." *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804). As explained by one court:

> "International practice is law only in so far as we adopt it, and like all common or statute law, it bends to the will of the Congress. . . . There is one ground only upon which a federal court may refuse to enforce an act of Congress and that is when the act is held to be unconstitutional. The act may contravene recognized principles of international comity, but that affords no more basis for judicial disregard of it than it does for executive disregard of it. . . .
>
> If, however, the court has no option to refuse the enforcement of legislation in contravention of principles of international law, it does not follow that in construing the terms and provisions of a statute it may not assume that such principles were on the national conscience and that the congressional act did not deliberately intend to infringe them. In other words, unless it unmistakably appears that a congressional act was intended to be in disregard of a principle of international comity, the presumption is that it was intended to be in conformity with it."

*The Over the Top*, 5 F.2d 838, 842 (D.Conn. 1925).

■ Much of international law is concerned with delineating the respective jurisdictional spheres of nations. Five principles govern the exercise of jurisdiction by a nation: the territorial principle, by which jurisdiction is based on the place where the offense was committed; the nationality principle, based on the nationality of the offender; the protective principle, which covers conduct which threatens the national security or operation of governmental functions, such as counterfeiting and falsification of official documents; the universality principle, under which the custody of a perpetrator of a crime of universal interest, such as piracy, provides jurisdiction; and the passive personality principle, based on the nationality of the victim.[37] As to jurisdiction over economic regulatory matters, only the territorial principle is applicable.[38] That principle, however, admits of two interpretations. Viewed subjectively, a state may extend its jurisdiction over persons found within its borders who violate its laws there. Under what the law styles an "objective interpretation," however, a state has jurisdiction over acts which take effect within its borders, regardless of the location of the actor. See *Rivard v. United States*, 375 F.2d 882, 886 (5th Cir.), *cert. denied*, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967).[39] It is this objective interpretation of the territorial principle of jurisdiction which has generally been accepted in American case law with respect to the Sherman Act, and which MELCO urges us to reject in favor of the subjective, absolute territorial principle.[40]

37. *See Rivard v. United States*, 375 F.2d 882, 885 (5th Cir.), *cert. denied*, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967); Restatement (Second) of Foreign Relations §§ 30–36 (1965).

38. While the passive personality principle could possibly support jurisdiction over antitrust violations on the theory that the "victim" is the United States populace, the United States does not accept this principle as a legitimate basis for jurisdiction. *See* Restatement (Second) of Foreign Relations § 30(a) and comment e.

39. We do not fully understand the objective/subjective dichotomy in this context. The usage appears to have widespread currency, however. *See, e. g.*, W. Fugate, *Foreign Commerce and the Antitrust Laws* (2d ed. 1973).

40. At oral argument, MELCO suggested that the effects doctrine (the objective territorial principle) was accepted internationally only in the criminal context, or at least that it was unacceptable as a basis for jurisdiction over economic regulation. This theory is plainly incorrect. *See* W. Fugate, *Foreign Commerce and the Antitrust Laws* 36–37 (2d ed. 1973). Indeed, the Japanese themselves apply their antitrust laws extraterritorially. *See* The Case of Nippon Yusen Kabushiki-Gaisha and Five Other Respondents, decided on August 18, 1972 by the Japanese Fair Trade Commission (1964) (Decision No. 2), as does the European Common Market, *see Imperial Chemical Industries, Ltd. v. E. C. Commission*, 1972 Common Market Law Reports 557, and both use the effects doctrine as a basis for their assertion of juris-

With these principles in mind, we must inquire as to the extent to which Congress intended to reach through the Sherman Act the type of conduct alleged in this action, as explicated by our case law.[41] Traditional principles of *stare decisis* of course apply.[42]

### C. *American Banana*

Because MELCO relies so heavily upon *American Banana Company v. United Fruit Company*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), our analysis must begin with a careful review of that case. The facts of *American Banana* are byzantine, best described by quotation:

> The plaintiff is an Alabama corporation, organized in 1904. The defendant is a New Jersey corporation, organized in 1899. Long before the plaintiff was formed, the defendant, with intent to prevent competition and to control and monopolize the banana trade, bought the property and business of several of its previous competitors, with provision against their resuming the trade, made contracts with others, including a majority of the most important, regulating the quantity to be purchased and the price to be paid, and acquired a controlling amount of stock in still others. For the same purpose it organized a selling company, of which it held the stock, that by agreement sold at fixed prices all the bananas of the combining parties. By this and other means it did monopolize and restrain the trade and maintained unreasonable prices. The defendant being in this ominous attitude, one McConnell, in 1903, started a banana plantation in Panama, then part of the United States of Columbia, and began to build a railway (which would afford his only means of export), both in accordance with the laws of the United States of Columbia. He was notified by the defendant that he must either combine or stop. Two months later, it is believed at the defendant's instigation, the governor of Panama recommended to his national government that Costa Rica be allowed to administer the territory through which the railroad was to run, and this although that territory had been awarded to Columbia under an arbitration agreed to by treaty. The defendant, and afterwards, in September, the government of Costa Rica, it is believed by the inducement of the defendant, interfered with McConnell. In November, 1903, Panama revolted and became an independent republic, declaring its boundary to be that settled by the award. In June, 1904, the plaintiff bought out McConnell and went on with the work, as it had a right to do under the laws of Panama. But in July, Costa Rican soldiers and officials, instigated by the defendant, seized a part of the plantation and a cargo of supplies and have held them ever since, and stopped the construction and operation of the plantation and railway. In August one Astua, by *ex parte* proceedings, got a judgment from a Costa Rican court, de-

diction. Moreover, this argument of MELCO's is inconsistent with the argument pursued by it more strenuously, that we should be particularly chary of applying a punitive statute (such as the Sherman Act) to acts beyond our borders, thus analogizing this civil antitrust suit to a criminal one. If this action is similar to a criminal action, then presumably international law would support jurisdiction based on the effects principle even under MELCO's own theory.

**41.** The legislative history of the Sherman Act, found in 21 *Cong.Rec.*, does not address the foreign reach of the Act beyond mentioning that it extends to foreign commerce. *See* 21 *Cong.Rec.* 2461–62 (remarks by Sen. Sherman) (1890). The paucity of discussion relevant to foreign commercial activity has led one commentator to declare the Sherman Act's legislative history to be "simply useless in dealing with specific fact situations in American foreign trade." Ongman, *"Be No Longer a Chaos": Constructing a Normative Theory of the Sherman Act's Extraterritorial Jurisdictional Scope*, 71 Nw.U.L.Rev. 733 (1977). *See* Kintner & Griffin, *Jurisdiction Over Foreign Commerce Under the Sherman Antitrust Act*, 18 B.C.Ind. & Comm.L.Rev. 199, 201–02 (1977).

**42.** We emphasize again that it is United States law which we are bound to apply. The international law which we apply is not that expounded by the commentators, but that which has been accepted as part of our domestic law; as a district court, we are not at liberty to write on *tabula rasa* as MELCO urges we should.

claring the plantation to be his, although, it is alleged, the proceedings were not within the jurisdiction of Costa Rica, and were contrary to its laws and void. Agents of the defendant then bought the lands from Astua. The plaintiff has tried to induce the government of Costa Rica to withdraw its soldiers, and also has tried to persuade the United States to interfere, but has been thwarted in both by the defendant and has failed. The government of Costa Rica remained in possession down to the bringing of the suit.

*Id.* at 354–55, 29 S.Ct. at 511–512.

In sum, plaintiff alleged that his property was seized by the government of Costa Rica at defendant's instigation. Using extremely broad language, the Court, speaking through Mr. Justice Holmes, held that there was no cause of action in the United States on these facts. In a much-quoted passage, Justice Holmes stated that "the general and almost universal rule is that the character of an act as lawful or unlawful must be determined wholly by the law of the country where the act is done." *Id.* at 356, 29 S.Ct. at 512. Since all of the acts alleged here took place outside the country, it "would be an interference with the authority of another sovereign, contrary to the comity of nations," to attempt to assume jurisdiction. *Id.* Furthermore, these considerations "would lead, in a case of doubt, to a construction of any statute as intended to be confined in its operation and effect to the territorial limits over which the lawmaker has general and legitimate power. 'All legislation is prima facie territorial.'" *Id.* at 357, 29 S.Ct. at 513 (citations omitted).

MELCO is quite correct that *American Banana* has never been explicitly overruled.

However, its authority has been so eroded by subsequent case law as to have been effectively limited to its specific factual pattern. Before turning to those later cases, two major factors which distinguish *American Banana* from the mainstream merit brief discussion. The first, urged by plaintiffs, is that the complaint in *American Banana* alleged no adverse effect on United States commerce, focusing instead on monopolization of the foreign market. Although we believe this to be a somewhat tenuous argument, relying as it does on an implication from silence in the opinion, subsequent cases do appear to have distinguished *American Banana* on this ground.[43]

A more serious distinguishing factor lurking in *American Banana* is the intimate involvement of instrumentalities of foreign sovereigns, implicating the act of state doctrine.[44] While the opinion makes no reference to that doctrine, Justice Holmes was clearly deeply concerned over the potential affront to the governments of Panama and Costa Rica. While there is a potential for offending a foreign nation whenever jurisdiction is asserted over one of its nationals, that offense is plainly greater when the acts of the sovereign itself are at issue. Many courts have distinguished *American Banana* on act of state grounds, explaining that the act of state implications of the opinion maintain their validity, while those dealing with subject matter jurisdiction do not. *See, e. g., Hunt v. Mobil Oil Corp.,* 550 F.2d 68 (2d Cir.), *cert. denied,* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977).

### D. *Pre-Alcoa Erosion of American Banana*

The first hint by the Supreme Court that *American Banana* might be construed to be

---

**43.** *See, e. g., Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 705, 82 S.Ct. 1404, 1413, 8 L.Ed.2d 777 (1962); *United States v. Aluminum Co. of America,* 148 F.2d 416, 443 (2d Cir. 1945).

**44.** The act of state doctrine provides that "[e]very sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." *Under-*

*hill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897). *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287 (3d Cir. 1979); *Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597 (9th Cir. 1976). The instant litigation also contains act of state issues, which will be addressed in a separate opinion.

weaker than its broad language would imply came only two years later in *United States v. American Tobacco Co.*, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911).[45] The Court in that case did not discuss the question of subject matter jurisdiction over foreign corporations, but did in fact assert such jurisdiction, noting that the conspiracy there charged violated the Sherman Act, "including the foreign corporations in so far as by the contracts made by them they became co-operators in the combination." *Id.* at 184, 31 S.Ct. at 650. The contracts to which the foreign corporations were parties had been executed in England. *Id.* at 172, 31 S.Ct. at 645.

Two years later the waters were further muddied by the decision in *United States v. Pacific & Arctic Railway & Navigation Co.*, 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742 (1913), in which defendants, both United States and foreign, were charged with monopolization of the transportation routes between ports in the United States, Canada and Alaska. The Court seemed to imply that it could assert no jurisdiction over foreign corporations operating abroad: "If we may not control foreign citizens or corporations operating in foreign territory, we certainly may control such citizens and corporations operating in our territory . . ." *Id.* at 106, 33 S.Ct. at 448. However, because the disputed route lay partially in the United States and partially without, the Court assumed jurisdiction over the entire alleged combination. It explicitly rejected the notion that the law could have no extraterritorial application whatsoever, noting that such a construction would place combinations such as this, monopolizing an international transportation route, out of the jurisdictional sphere of any country. The end result was that Sherman Act jurisdiction was extended to foreign corporations operating in part abroad, but in part in the United States.

A similar result was reached in *Thomsen v. Cayser*, 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597 (1917), which alleged a restraint of transportation between New York and South Africa. The Court based its jurisdiction over the foreign defendants on the fact that the combination, though formed in a foreign country, nonetheless "affected the foreign commerce of this country and was put into operation here." *Id.* at 88, 37 S.Ct. at 360.

Contrary to MELCO's assertion, *United States v. Sisal Sales Corp.*, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927), did not reaffirm the absolute territorial doctrine recognized in *American Banana*. Nor, however, contrary to plaintiffs' contention, did it expressly limit *American Banana* to its particular facts. Rather, *American Banana* was distinguished as having a fact pattern "radically different" from that presented by *Sisal*, and "the doctrine there approved [was] not controlling" in *Sisal*. *Id.* at 275, 47 S.Ct. at 593. The *Sisal* defendants, both American and Mexican, had conspired to monopolize the importation and sale of sisal in the United States. It is unclear how much of the conspiratorial activity took place outside of the United States. It is plain that there was considerable foreign activity, and it is not clear that the Mexican corporation performed any acts outside of Mexico. Nonetheless, the Court found

> a contract, combination, and conspiracy entered into by parties within the United States and made effective by acts done therein. The fundamental object was control of both importation and sale of sisal and complete monopoly of both internal and external trade and commerce therein. The United States complain of a

---

45. Plaintiffs contend that the first hint of erosion of *American Banana* came in *Strassheim v. Daily*, 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1911), which broadly stated that "[a]cts done outside a jurisdiction but intending to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect," 211 U.S. at 285, 31 S.Ct. at 560.

*Strassheim* is plainly distinguishable on two grounds, however. First, it dealt with an interstate, rather than international, effect, and therefore had totally different comity ramifications. Moreover, it was a criminal extradition case in which material steps in the scheme to defraud were taken in the state seeking extradition, although the accused was not present in the state when the result ensued.

violation of their laws within their own territory by parties subject to their jurisdiction, not merely of something done by another government at the instigation of private parties. True, the conspirators were aided by discriminating legislation, but by their own deliberate acts, here and elsewhere, they brought about forbidden results within the United States.

*Id.* at 276, 47 S.Ct. at 593–594.

The lesson to be learned from these early Supreme Court cases is that the broad language of *American Banana*, implying that the United States could never assert jurisdiction over acts occurring abroad, is not to be construed as controlling, and that it is clearly permissible for the United States to assert jurisdiction over foreign corporations when acts in foreign countries are involved. But until 1945, no clear test emerged to explain exactly what circumstances would present a sufficient nexus with the United States in order to give rise to such jurisdiction. The task of providing such a test fell to Judge Learned Hand.

### E. ALCOA

The pivotal opinion dealing with subject matter jurisdiction over foreign corporations under the Sherman Act is *United States v. Aluminum Co. of America (Alcoa)*, 148 F.2d 416 (2d Cir. 1945) (L. Hand, J.).[46] The government had alleged that Alcoa, an American company, and Aluminium Limited ("Limited"), a Canadian company, had conspired with European producers of aluminum ingots to impose quotas on imports into the United States and to restrain interstate and foreign commerce in ingots. Limited, together with five European alu-minum producers, formed a Swiss corporation known as the "Alliance," which allocated on a quota basis the amount of aluminum to be produced. The original agreement was interpreted to exclude imports into the United States from the quotas. Five years later, the agreement was amended to abandon the rigid quota system, adopting instead a royalty system, under which a member exceeding its quota was required to pay to the Alliance an amount proportional to the excess, to be distributed among the member companies. This amended agreement did include United States imports.[47]

After determining that the American company, Alcoa, was neither a member of the Alliance nor a participant in any Sherman Act violation involving foreign commerce, 148 F.2d at 442, Judge Hand reversed the District Court's dismissal for lack of subject matter jurisdiction on the count against the Canadian company, Limited. He characterized the question presented as "whether Congress chose to attach liability to the conduct outside the United States of persons not in allegiance to it." *Id.* at 443. While recognizing that statutes should be read in light of the "limitations customarily observed by nations upon the exercise of their powers" and citing *American Banana* for the proposition that Congress should not be assumed to intend to punish actors for conduct which has no consequences within the United States, he nevertheless declared it to be "settled law . . . that any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its

**46.** Although not decided by the Supreme Court, *Alcoa* was a final, unappealable judgment. A quorum of the Supreme Court was unobtainable, and the appeal was certified to the Court of Appeals for the Second Circuit sitting as a special statutory court pursuant to 15 U.S.C. § 29, which authorized it to hear such cases "in lieu of a decision by the Supreme Court" and provided that such decision "shall be final and there shall be no review of such decision by appeal or certiorari or otherwise." The Supreme Court in *American Tobacco Co. v. Unit-ed States*, 328 U.S. 781, 811, 66 S.Ct. 1125, 1140, 90 L.Ed. 1575 (1946), declared that the "case was decided by the Circuit Court of Appeals for the Second Circuit under unique circumstances which add to its weight as a precedent."

**47.** Both agreements were silent on this point, but the members all agreed that United States imports were excluded under the first, but included under the amendment.

borders which the state reprehends . . . ." [48] *Id.* Accordingly, the court concluded that the Sherman Act could apply to conduct performed outside the United States by aliens, if that conduct was intended to adversely affect United States commerce and if it actually had such an effect. *Id.* at 444. Judge Hand did not specify the degree of effect nor the type of intent required. In applying the rule to the facts at hand, however, he implied that the intent required was of a general, and not specific, nature, using words such as "expected" and "supposed" to describe the Alliance members' state of mind. *Id.* As to the substantiality of the effect required, he said only that, once intent to affect United States commerce was shown, the burden of proof would shift to the defendants to show that there was no corresponding effect. *Id.*

Two additional points should be noted. First, the court interpreted the earlier cases of *U. S. v. Pacific & Arctic R. & Nav. Co., Thomsen v. Cayser*, and *Sisal*, all discussed *supra*, as not depending upon the fact that foreign parties had sent agents into the United States to perform illegal acts, noting that such agency does not differ from inanimate means. Thus, the physical presence of an agent of the foreign corporation was held not to be controlling.

Second, and contrary to MELCO's vigorous assertion, the court did not rely upon any instrumentality relationship between Limited and the American company, Alcoa. In fact, the lower court had found that Alcoa and Limited had "become altogether free from any connection" and that Alcoa had had nothing to do with the Alliance. 148 F.2d at 441. Judge Hand accepted those findings as not unreasonable, and predicated his opinion as to Limited's liability upon the assumption that there had been a total separation.

Subsequent case law has attempted to refine the test first enunciated in *Alcoa*.

*F. Adoption and Refinement of the Alcoa Test*

*1. American Banana's Rejection*

The current viability of *American Banana* vis-a-vis *Alcoa* and subsequent cases was pithily summarized in *Dominicus Americana Bohio v. Gulf & Western Industries, Inc.*, 473 F.Supp. 680, 687 (S.D.N.Y. 1979), as follows:

In a 1909 opinion by Justice Holmes, the Supreme Court cast doubt on the applicability of the anti-trust laws to actions outside the territory of the United States [citing *American Banana*]. If that case were still good law, I would not hesitate to dismiss the complaint here for lack of subject matter jurisdiction. However, history has proven *American Banana* to be not a seminal decision but an aberration: it is apparently the only foreign trade antitrust case lost by the Department of Justice for want of jurisdiction. There is now broad agreement that its holding on the issue of jurisdiction is obsolete [citations omitted].

The breadth of agreement that *American Banana's* jurisdictional implications are obsolete is best reflected by the fact that the critics of the United States courts' broad jurisdictional reach so concede, arguing instead that current law is incorrect. *See, e. g.*, Raymond, *A New Look at the Jurisdiction in Alcoa*, 61 Am.J.Int'l L. 558 (1967). While the Supreme Court has never in terms disavowed or overruled *American Banana*, it has held it to be not controlling and has cited *Alcoa* with approval. In *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), the Court expressly rejected a Canadian corporation's argument that *American Banana* protected it, stating that the reliance on *American Banana* was "misplaced." "A conspiracy to monopolize or restrain the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign

---

**48.** This arcane usage, the subject of comment by a number of commentators, is a verb form of the adjective "reprehensible."

countries." *Id.* at 704, 82 S.Ct. at 1413. Furthermore, the Court differentiated the *Sisal* case, *supra*, from *American Banana* on the basis that in *Sisal* the "activities of the defendants had an impact within the United States and upon its foreign trade . . ." *Id.* at 705, 82 S.Ct. at 1414. Although the foreign corporation involved in *Continental Ore* was a subsidiary of an American company, the court did not rest its holding on that ground.

In even stronger terms, but in the context of a trademark infringement suit brought not under the Sherman Act but under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, the Court in *Steele v. Bulova Watch Co.*, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 (1952), stated that *American Banana* "was not meant to confer blanket immunity on trade practices which radiate unlawful consequences here, merely because they were initiated or consummated outside the territorial limits of the United States. Unlawful effects in this country, absent in the posture of the *Banana* case before us, are often decisive; this court held as much in *Thomsen v. Cayser,* [*supra*] and [*Sisal supra*]," (also citing *Alcoa* ).[49]

Not surprisingly therefore, the lower courts have uniformly rejected *American Banana,* asserting jurisdiction over foreign nationals and foreign activities in a wide variety of contexts. *See In re Uranium Antitrust Litigation,* 617 F.2d 1248 (7th Cir. 1980); *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287 (3d Cir. 1979); *Industrial Investment Development Corp. v. Mitsui & Co.,* 594 F.2d 48 (5th Cir. 1979), *cert. denied,* 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980); *Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597 (9th Cir. 1976); *Dominicus Americana Bohio v. Gulf & Western Industries, Inc.,* 473 F.Supp. 680 (S.D.N.Y.1979); *Fleischmann Distilling Corp. v. Distillers Co.,* 395 F.Supp. 221 (S.D. N.Y.1975); *United States v. The Watchmakers of Switzerland Information Center, Inc.,* 1963 Trade Cases ¶ 70,600 (S.D.N.Y.

1963) (*Swiss Watchmakers* ); *United States v. Imperial Chemical Industries, Ltd.,* 100 F.Supp. 504 (S.D.N.Y.1951); *United States v. General Electric Co.,* 82 F.Supp. 753 (D.N. J.1949); *United States v. National Lead Co.,* 63 F.Supp. 513 (S.D.N.Y.1945), *aff'd,* 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947). *Cf. Hunt v. Mobil Oil Corp.,* 550 F.2d 68 (2d Cir.), *cert. denied,* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977); *United States v. Westinghouse Electric Corp.,* 471 F.Supp. 532 (N.D.Cal.1978); *United States v. N.V. Nederlandsche Combinatie Voor Chemische Industrie,* 428 F.Supp. 114 (S.D. N.Y.1977).

Extended analysis of these cases would be superfluous, for it is abundantly plain that some extraterritorial application of the Sherman Act is proper. Such a result is perhaps mandated by the vastly altered economic climate since the time of *American Banana,* with the vast increase in complex international corporate and trade interrelationships. It is sufficient to point out that the Third Circuit, in *Mannington Mills, supra,* commented that the Supreme Court in *Continental Ore, supra,* had cited with approval *Alcoa's* "intended effects" test. 595 F.2d at 1292. Although the *Mannington Mills* parties were both American companies, the court nonetheless spoke broadly of the jurisdictional reach of the Sherman Act, rejecting *American Banana* and adopting *Alcoa.* Thus, precedent in this circuit is clear.[50]

MELCO has cited a number of cases which it maintains cite *American Banana* with approval. All are easily distinguished from the cases cited *supra. Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); *Foley Bros. v. Filardo,* 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949); *Jackson v. The Archimedes,* 275 U.S. 463, 48 S.Ct. 164, 72 L.Ed. 374 (1928); *New York Central R. Co. v. Chisholm,* 268 U.S. 29, 45 S.Ct. 402, 69 L.Ed. 828 (1925); and *Sandberg v. McDonald,* 248 U.S. 185, 39 S.Ct. 84,

---

**49.** *See also Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

**50.** A more extended discussion of *Mannington Mills* appears *infra.*

63 L.Ed. 200 (1918), were all decided with reference to congressional intent as to the particular statute involved; none dealt with international economic regulation. *Cuba Railroad Co. v. Crosby*, 222 U.S. 473, 32 S.Ct. 132, 56 L.Ed. 274 (1912), a personal injury action, was decided according to traditional conflict of laws principles. *Kohn v. American Metal Climax, Inc.*, 458 F.2d 255 (3d Cir.), *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972), a securities case, mentioned *American Banana* only in a lengthy opinion by Judge Adams, concurring and dissenting. Judge Adams pointed out that "the extraterritorial effect of an Act of Congress is circumscribed; it may not regulate the conduct of a foreign corporation in a foreign country where there is no nexus with the United States." *Id.* at 310. We do not quarrel with that language; the question, however, is what constitutes a sufficient "nexus" with the United States. *Alcoa's* "intentional effect on United States commerce" standard defines that nexus. We have no difficulty in concluding that Judge Adams would agree, for he was a member of the panel which decided *Mannington Mills, supra*. While he wrote separately in that case, he nonetheless explicitly adopted Judge Hand's *Alcoa* test, as later interpreted by *Timberlane Lumber Co. v. Bank of America, supra*. *Mannington Mills, supra*, 595 F.2d at 1301.

Nor does *Todhunter-Mitchell & Co. v. Anheuser-Busch, Inc.*, 383 F.Supp. 586 (E.D.Pa. 1974), aid MELCO; in fact, in that case Judge Bechtle specifically noted that "*American Banana* is inapplicable to situations where the activities of the defendant have an impact within the United States and upon its foreign trade." 383 F.Supp. at 588. Finally, MELCO cites *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), but neglects to mention that the same footnote which cites *American Banana* cites *Alcoa* as well. The Court was concerned with the liability of an American manufacturer who participated in a foreign patent pool, finding that liability "beyond question."

395 U.S. at 113 n. 8, 89 S.Ct. at 1571 n. 8. However, the foreign participants in the conspiracy were apparently not parties to the action, so that the question raised in the instant action was never addressed.

Thus, MELCO has cited no case which would lead us to believe that, contrary to all other reports, *American Banana* retains any vitality beyond its act of state implications. MELCO vigorously argues, however, that the cases which have been discussed *supra* as adopting an "intentional effects" test for subject matter jurisdiction in the international antitrust field do not extend jurisdiction to foreign nationals acting solely in a foreign country. There are two major difficulties with this argument, even aside from the unsoundness of its implication that *Alcoa* is not good law. First, it is simply untrue that no case has reached foreign conduct abroad. Perhaps plainest is *Fleischmann Distilling Corp. v. Distillers Co.*, 395 F.Supp. 221 (S.D.N.Y.1975), which refused to dismiss a private antitrust action against a foreign firm whose products were sold F.O.B. United Kingdom. *See also United States v. General Electric Co.*, 82 F.Supp. 753 (D.N.J.1949); *Swiss Watchmakers, supra*.

■ Secondly, there is a fundamental fallacy in MELCO's argument as it relates to this litigation. MELCO has described itself as an isolated foreign manufacturer which committed no acts outside Japan. Even assuming that to be true, however, MELCO has overlooked the fact that what is alleged in this case is a worldwide conspiracy in which MELCO is alleged to be a single link—one of almost one hundred alleged coconspirators, twenty-four of whom are defendants (and none of whom has asserted lack of subject matter jurisdiction). As such, MELCO is alleged to be a knowing participant in a conspiracy which included some United States companies and some of the acts in furtherance of which occurred in this country. It is abundantly plain from the cases discussed that the Sherman Act can reach an entire conspir-

acy, and all participants therein, regardless of the position of any single conspirator.[51]

## 2. Scope of Extraterritorial Jurisdiction

The cases which have rejected *American Banana* and have asserted extraterritorial jurisdiction under the Sherman Act have variously described how far that jurisdiction should extend, with the primary difference being in the substantiality of the effect on United States commerce required. Formulations include "directly and materially affect[s] foreign commerce";[52] "the combination affected the foreign commerce of this country";[53] "[the conspiracy] intended to affect imports or exports";[54] "though there is no showing as to the extent of commerce restrained it [the contract] deleteriously affected [United States] commerce";[55] "[the conspiracy had] the effect of suppressing imports into and exports from the United States";[56] "a conspiracy . . . affecting American commerce";[57] "a direct and influencing effect on trade between the United States and foreign countries";[58] or "a conspiracy . . . affects American commerce."[59]

The most thorough and thoughtful analysis of the concerns relevant to the assertion of extraterritorial jurisdiction was provided by Judge Choy in *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597 (9th Cir. 1976). He found the effects test alone incomplete for failure to take into account the comity concerns emphasized so strenuously by MELCO and the commentators, and devised a tripartite analysis. First, rejecting the argument that the effect must be "substantial" or "direct," he required "some" effect, either actual or intended.[60] Second, he required an effect "sufficiently large to present a cognizable injury to the plaintiffs and, therefore, a civil *violation* of the antitrust laws." Finally, he instituted a balancing process to determine whether the interests of the United States were sufficiently strong, when balanced against those of other nations involved, to justify extension of extraterritorial jurisdiction. 549 F.2d at 613. Factors to be considered in this comity analysis included:

the degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either

51. We of course take no position with regard to the factual basis of this alleged conspiracy. We have not addressed MELCO's constitutional arguments, outlined at p. 1170 *supra*, because we find them frivolous. The fact that the Constitution gives authority over foreign commerce to the legislative and executive branches of government does not preclude Congress from ceding a portion of that power to the judiciary, or, indeed, to private citizens via the "private attorney general" provision of the Sherman Act. In fact, the entire jurisdiction/substantive merits question of "effect on commerce" exists precisely to avoid constitutional infirmity.

52. *United States v. Hamburg-Amerikanische Packet-Fahrt-Actien Gesellschaft*, 200 F. 806, 807 (S.D.N.Y.1911), *rev'd on other grounds*, 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387 (1916).

53. *Thomsen v. Cayser*, 243 U.S. 66, 88, 37 S.Ct. 353, 360, 61 L.Ed. 597 (1917).

54. *United States v. Aluminum Co. of America*, 148 F.2d 416, 444 (2d Cir. 1945).

55. *United States v. General Elec. Co.*, 82 F.Supp. 753, 891 (D.N.J.1949).

56. *United States v. National Lead Co.*, 63 F.Supp. 513, 527 (S.D.N.Y.1945), *mod. and aff'd*, 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947).

57. *Id.* at 525.

58. *United States v. Timken Roller Bearing Co.*, 83 F.Supp. 284, 309 (N.D.Ohio 1949), *mod. and aff'd*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

59. *United States v. Imperial Chemical Ind., Ltd.*, 100 F.Supp. 504, 592 (S.D.N.Y.1951).

60. Judge Choy suggested that the substantiality test had crept into the analysis via the comparable test required in the interstate context in order to save federal regulation from being unconstitutional. Since there is no constitutional problem in defining congressional power over foreign commerce, however, he considered it unwise "blindly to apply the 'substantiality' test to the international setting." 549 F.2d at 612. *Cf. Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).

state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.

Thus, the substantiality of the effect on United States commerce was subsumed into the comity analysis as a factor to be balanced, rather than being a formulaic requirement of uncertain degree.[61]

The Third Circuit adopted Judge Choy's approach in large part, albeit within a different analytical framework, in *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287 (3d Cir. 1979). The panel majority there made short work of the subject matter jurisdiction question, citing *Alcoa* and *Continental Ore*, and concluding that subject matter jurisdiction plainly exists over conduct abroad at least when, as was the case there, the parties are American corporations.[62] 595 F.2d at 1291–92. However, having concluded that, based upon the effects test, subject matter jurisdiction was present (and, further, deciding that the act of state doctrine was inapplicable on the facts presented), the court went on to examine whether that jurisdiction should be exercised. Thus, questions of comity and international repercussions were considered relevant to an abstention-style inquiry, rather than to the subject matter jurisdiction determination.[63] Patterned after the *Timberlane* balancing approach, the factors adopted by the Third Circuit to be weighed in determining whether extraterritorial jurisdiction should be exercised are:

1. Degree of conflict with foreign law or policy;

2. Nationality of the parties;

3. Relative importance of the alleged violation of conduct here compared to that abroad;

4. Availability of a remedy abroad and the pendency of litigation there;

5. Existence of intent to harm or affect American commerce and its foreseeability;

6. Possible effect upon foreign relations if the court exercises jurisdiction and grants relief;

7. If relief is granted, whether a party will be placed in the position of being forced to perform an act illegal in either country or be under conflicting requirements by both countries;

**61.** Section 18 of the Restatement (Second) of Foreign Relations suggests a similar approach:
 A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either
 (a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or
 (b)(i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and (iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems.

**62.** MELCO contends that this fact alone totally distinguishes *Mannington Mills* from the instant litigation. We disagree. While the broad language there may technically be dictum, the analytical approach, if not the factual pattern, is plainly applicable.

**63.** *Mannington Mills* was decided by a divided panel: the opinion was written by Judge Weis and joined by District Judge Weiner sitting by designation; Judge Adams joined portions of the opinion and concurred in the result, but differed as to the analytical approach. We are, of course, bound by the majority's view, described in the text, which creates a tidy framework, easily workable in practice.

On the other hand, Judge Adams' view that consideration of factors of international comity is part of the jurisdictional determination rather than a separate, subsequent matter viewed within an abstention framework finds much support in the caselaw. *See Mannington Mills, supra*, 549 F.2d at 1301–02 n. 9 (Adams, J., concurring). *But see In re Uranium Antitrust Litigation*, 617 F.2d 1248 (7th Cir. 1980).

8. Whether the court can make its order effective;

9. Whether an order for relief would be acceptable in this country if made by the foreign nation under similar circumstances;

10. Whether a treaty with the affected nations has addressed the issue.

595 F.2d at 1297–98.[64]

■ Because *Mannington Mills* is distinguishable from the case at bar in that the parties in that case were both American firms, and the issues were therefore simpler, we have chosen not to rest solely upon its subject matter jurisdiction discussion, setting forth instead the foregoing exegesis of the relevant case law. Our independent canvass convinces us that the *Alcoa* plus comity test applied in *Mannington Mills* is equally appropriate for the case at bar. Therefore, when we examine the factual record in this case, we will look for 1) intent to affect United States commerce;[65] 2) some actual effect on that commerce; and 3) facts relevant to balancing the ten comity factors outlined in *Mannington Mills, supra.*[66]

## V. CONCLUSION

· The factual analysis required for a finding of subject matter jurisdiction over MELCO would not be difficult in view of the developed state of the record. However, because it overlaps with the analysis necessary to determine MELCO's complicity in the alleged conspiracy, which must in any event be determined in connection with the conspiracy motions, and because taking the time to make it here would deter us from more important rounds, we will defer the factual portion of our jurisdictional analysis until we examine the record in connection with consideration of the summary judgment motion addressed to the conspiracy issue. In this opinion, we have resolved the purely legal aspects of the subject matter jurisdiction question, determining that the decision is one for the court, at least in a case such as this where the jurisdictional and substantive questions are sufficiently distinct; that a low threshold of proof is all that is required for a jurisdictional determination; and that the American antitrust laws do extend to conduct abroad by foreign corporations, at least when that conduct is intended to affect United States interstate or foreign commerce, when it actually has such an effect, and when a balancing of considerations of international comity leads the court to exercise that jurisdiction.

64. *See also* the "jurisdictional rule of reason" outlined in *K. Brewster, Antitrust and American Business Abroad* 446 (1958). In the *Uranium Antitrust* case, *supra* n. 63, the 7th Circuit declined to adopt the *Mannington Mills* or *Timberlane* comity factors in the unique procedural posture of that case, where foreign corporations had refused to appear and default judgments were entered. Instead, the court found that the district court had not abused its discretion by considering only the complexity of the multi-national action, the seriousness of the charges, and the recalcitrant attitude of the defaulters. 617 F.2d at 1254–56.

65. It is plain that the intent required is general, and not specific. *See, e. g., Alcoa, supra; Fleischmann Distilling Corp. v. Distillers Co.,* 395 F.Supp. 221, 227 (S.D.N.Y.1975); *United States v. General Electric Co.,* 82 F.Supp. 753, 891 (D.N.J.1949); W. Fugate, *Foreign Commerce and the Antitrust Laws* 48 (2d ed. 1973). Many of the cases fail to mention intent as a requirement at all; this is possibly because, since parties are deemed to intend the natural consequences of their acts, intent is easily inferred from the factual patterns under analysis.

66. We note that the substantiality of both the effect and the intent are taken into consideration in the balancing process.